IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

BLAIR-NAUGHTON, L.L.C., d/b/a
GOODLAND STEAKHOUSE DINER,

Plaintiff,

vs.                                                    Case No. 06-1183-JTM

DINER CONCEPTS, INC., A Georgia
Corporation and DAVID H. BERNSTEIN,

Defendants.

MEMORANDUM AND ORDER

Several motions are before the court in this action.  The court first addresses defendant
David Bernstein's Motion for Summary Judgment on Plaintiff's fraud claims.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories,
and admissions on file, together with affidavits, if any, show there is no genuine issue as to any
material fact, and that the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P.
56(C).  In considering a motion for summary judgment, the court must examine all evidence in a
light most favorable to the opposing party.  *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th
Cir. 1988).  The party moving for summary judgment must demonstrate its entitlement to summary
judgment beyond a reasonable doubt.  *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir.
1985).  The moving party need not disprove plaintiff's claim; it need only establish that the factual
allegations have no legal significance.  *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d
1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere
allegations or denials contained in its pleadings or briefs.  Rather, the nonmoving party must come
forward with specific facts showing the presence of a genuine issue of material fact for trial and

significant probative evidence supporting the allegation.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  Once the moving party has carried its burden under Rule 56 (C), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts.  "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'"  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*).  One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

The following facts are established.  On March 21, 2005, Diner Concepts entered into a commercial sales contract with Blair-Naughton for Blair-Naughton to purchase a Happy Days Diner for a purchase price of $537,500.00.

Blair-Naughton is a Kansas limited liability company. Thomas Blair is the restaurateur and principal of Blair-Naughton who engaged in negotiations on behalf of Blair-Naughton before the contract was signed.

DCI is a Georgia corporation which was incorporated in 1995. David Bernstein is the President of DCI, and he executed the sales contract in his representative capacity as the President of the Seller, DCI, and not in his individual capacity. DCI does not build diners, it contracts with manufacturers to build them. Wilkins Mobile Builders, Inc. was the manufacturer who built the diner at issue in this case.

A Happy Days Diner is a particular model of modular building and had a standard 2005 model price of $699,500 for seating of 110-120. A Diner-Mite Diner of the same seating capacity costs $879,900.  There is a fact dispute as to the nature of the diners.  According to Bernstein, a Happy Days Diner has wood studs and a vinyl covered floor. The standard model price list states that a Happy Days Diners have Omega-Lite exterior with only stainless steel trim. A Diner-Mite Diner is a different, higher quality, model of modular building, with steel studs, a poured concrete floor

2

with ceramic tile, a stainless steel exterior and a domed ceiling in the customer area. According to Bernstein, the pricing differential between the two diners was discussed with Blair-Naughton before the contract was signed. Diner Concepts is the marketing company for Happy Days Diners. According to Thomas Blair, however, he was advised that the pricing deferential between a "Happy Days" diner model and a "Dinermite" diner model had to do with wood versus steel studding, tile versus ceramic floors and standard versus raised ceiling, not the overall quality of the diner. Blair-Naughton also alleges that Bernstein did not use different companies to market the two models, and only made a distinction between the two companies when litigation was expected.

The parties also differ as to the role played by Pete Whalen, an attorney for Blair-Naughton. According to Bernstein, Whalen was originally responsible for setting up Blair-Naughton LLC. In 2005, he was disbarred. He remained active in the Blair-Naughton project as a consultant, and participated in a number of discussions and meetings regarding the Blair-Naughton project and was Blair-Naughton's focal point for communication with others. Whalen helped Blair with the diner project and often acted on behalf of Blair and Blair-Naughton. Blair was aware that Whalen frequently communicated with others on behalf of the project and never told Whalen not to act for Blair-Naughton. According to Blair-Naughton, on the other hand, Whalen's role in the diner project, was limited to forming the Blair-Naughton as an entity, coordinating logistics, and allowing Tom Blair to use his Goodland office during the project. Whalen was not a construction expert, could not read plans, is elderly, and was not authorized to deal with Defendants on construction issues, which were all handled by Tom Blair.

Thomas Blair knew there were differences between a Happy Days Diner and a Diner-Mite Diner from several conversations with Diner Concepts salesman Don Memberg before the contract was signed. He knew Diner-Mite diners had steel studs, included a stainless steel exterior, had ceramic floor and raised dome ceiling, that the Happy Days Diner had wood frame construction and a linoleum floor. Blair did not want to pay the substantial increased cost of a Diner-Mite diner, as it was not in the budget. He knew he was purchasing a Happy Days Diner.

Paragraph 1.01 of the Sales Contract said that Blair-Naughton agreed to purchase a diner built and equipped as per Exhibits: A – Plans, B – Equipment List, C – Purchaser's Installation Responsibilities, and D – Seller's On-site Responsibilities. Exhibit "A" was intended and stated to be "State Certified Plans:"

Paragraph 3.03 of the sales contract said that the diner

must be specially ordered for Purchaser and is estimated to be delivered to Purchaser's site in about 120 (one hundred twenty) days after the approval of state-certified plans and final plan approval by local municipalities and Purchaser.

(Df. Exh. 1, at BN00088). It also provides delivery was "subject to delays in obtaining state-certified engineered plans, manufacture or delivery due to fire, flood, earthquakes, tornadoes, hurricanes, snowstorms windstorms, riots civil disobedience, strikes, Acts of God, or other causes beyond the control of Seller." (Id.)

The references to the Exhibit A State-Certified Plans means construction plans that have been certified by an engineer licensed in Kansas. The State-Certified plans did not exist at the time the contract was signed. Blair knew at the time the contract was signed that the State-Certified plans would subsequently be provided and incorporated in the contract. Blair further understood that the engineer-stamped, State-Certified plans had to be submitted to the building inspection department before the building could be set. The plaintiff cites testimony from Memberg that obtaining state certification was the responsibility of the seller. (Memberg Dep. at 34-35).

The parties dispute the nature of the parties' understanding of the contract. Bernstein stresses a statement by Blair in his deposition indicating that he had limited contact with Bernstein before signing the contract. Further, he had no discussions with Bernstein about specifications for the diner before the contract was signed, and indeed never discussed diner specifications with Bernstein. Blair-Naughton cites the testimony of Memberg that Bernstein was aware of the agreed set of plans, yet chose to intentionally substitute other plans.

Blair-Naughton, as the purchaser, had the sole obligation to prepare the site/location for the diner and to prepare any footings/foundation in accordance with State-Certified Approved

4

Foundation plans, in accordance with Exhibit "C" to the Sales Contract. There is in fact conflict as to the preparation of the diner's foundation. According to Bernstein, Blair-Naughton decided to construct the foundation before it had received any plans for the diner; having instead obtained from Memberg a one page diagram of a diner "from Carolina" that showed the dimensions of the diner purchased by Blair-Naughton, but it was not a Happy Days Diner. Blair gave the diagram to its contractor to use in building the foundation despite the fact that it was not engineer-approved, and knowing the diagram was not for the diner he purchased. According to Blair-Naughton, Memberg sent Blair foundation plans for a diner that had been constructed in North Carolina which matched the plans being prepared for Plaintiff, and that Blair did later receive and approve the plans that matched the North Carolina diner, and assumed that Diner Concepts would have those plans certified.

In May of 2005, Blair-Naughton constructed the foundation for the building. The contractor used the one-page plan knowing it was for the diner located in a state other than Kansas (he thought it was a New Mexico diner). The record reflects it was a page from the North Carolina diner. The building inspector, Steve Criswell, was aware that the required plans were not available, but the project went forward because of "local pressure" to get the job going. Criswell conceded that it was impossible to verify that the foundation would match the building in the absence of the contract foundation plans. This later led to problems as the delivered building did not match the plans used for the foundation and consequently caused structural problems with the building.

While the building inspector allowed Blair-Naughton to construct the foundation without the required engineer-stamped plans, the inspector continued to have "numerous" conversations with Whalen reminding him that a set of engineer-stamped plans were required. Whalen and Blair also had conversations with Larry White, their site and foundation contractor, about the fact that certified plans were needed before the City would issue a building permit.

The present lawsuit, in part, is a dispute over which of two sets of plans are the plans stipulated by the contract. The plans relied on by Blair-Naughton have been identified in the

deposition record as Exhibit 2 and are attached to Bernstein's Memorandum as Exhibit 7. The "State-Certified" plans relied on by DCI and Bernstein have been identified in the deposition record as Exhibit 4 or Exhibit 4A and the copy identified as Exhibit 4A is attached to Bernstein's Memorandum as Exhibit 8.

In June of 2005, Memberg sent a set of plans to Blair-Naughton via Pete Whalen. According to Bernstein, those plans were internal working plans, and Memberg was not authorized to send them.  These identified the Diner-Mite name, made no reference to a Happy Days model, had no "State-Certification" or engineer approval and did not conform to the requirements of Exhibit A to the contract, which mandated that certification and approval. Blair-Naughton contends that Blair and Memberg agreed to the plans set forth in Exhibit 7, and that Blair never agreed to the plans set forth in Exhibit 8. Blair-Naughton argues that Memberg had apparent authority to send the plans.  Blair received the plans from Whalen, initialed and approved them, and returned them to Diner Concepts.

Bernstein denies receiving the returned plans.  Blair acknowledges that he knew "State-Certified" plans were stipulated by the contract, and that he has no memory of anyone telling him that the June 2005 plans qualified as the "State-Certified" plans under the contract. As late as September 8, 2005, Bernstein wrote Blair a letter telling him that the engineer-stamped plans had been delayed because of Hurricane Katrina, but would arrive shortly.

The diner's "State-Certified Plans" were delivered to Blair-Naughton by DCI via Federal Express, and filed with building inspector Criswell at the Goodland Building Inspection Office on behalf of Blair-Naughton on September 12, 2005, approximately five months before the diner was delivered. Whalen delivered those plans, which were engineer-stamped and certified by Kevin Finn, an engineer licensed to practice in Kansas. Whalen has testified that he would have "absolutely" shown these plans to Blair and Larry White, Blair's contractor. (White dep. at 43). Blair concedes that the City of Goodland authorized installation of the diner at the Goodland site based on the State-Certified plans provided by DCI.  According to Blair-Naughton, Whalen was not authorized to

receive the plans, and Whalen failed to show the plans to Blair.  Blair did know that the plans sent in September were for a more modest building than he had approved in June.

It was only after the receipt of the "State-Certified" plans and the filing of those plans with the City of Goodland, that Wilkins began construction of the diner. After the diner was completed, it was made available for inspection in accordance with Section 3.01 of the contract. On November 28, 2005, Blair had a telephone conversation with Pete Whalen and David Bernstein about the inspection. Bernstein told them where the diner was located. Blair says Bernstein assured him the diner was built the way he approved it. While Blair says he was discouraged from making the inspection, he acknowledged he had the right to do so. And Whalen, participating in the same conversation, acknowledged that Bernstein never told Blair that he couldn't inspect the diner. This conversation occurred more than 2 months after Whalen (a participant in the conversation) had received and filed the "State-Certified" plans.

Blair-Naughton's fraud-based complaints do not assert any claim of manufacturing defect in the diner built by Wilkins, but allege that Bernstein "substituted" a diner based on deposition Exhibit 4A /Exhibit 8, for a diner based on deposition Exhibit 2/Exhibit 7 plans.

In response to the motion for summary judgment, the plaintiff cites the deposition testimony of Frank Kretch, the architect that prepared the plans, and Benny Berry, the contractor that built the diner, which contradicts the testimony of Bernstein that he had never seen the Agreed Plans. According to plaintiff, the plans were changed only after Bernstein spoke with Berry, and that Berry agreed to a more modest diner in order to minimize costs.

As noted earlier, the defendant Bernstein seeks summary judgment on Blair-Naughton's claims of fraud.  Specifically, he contends that no fraud action is appropriate because Bernstein never spoke directly with Blair, because the State-Certified Plans were submitted to the plaintiff (which then duly filed them with the City), because Blair never inspected the building, and because the evidence fails to show any fraud in inducing the contract.

7

Thus, the plaintiff argues generally that there can be no fraud, because when Bernstein spoke with Blair in November of 2005, and indicated that the diner would be built according to the plans, the more modest diner plans had already been received by the plaintiff's lawyer, Whalen, in September, and filed with the City of Goodland. The court finds that it need not resolve these issues, because it finds that, in light of the evidence presented, plaintiff has at best presented a claim sounding in fraud.

Plaintiff's evidence (and using its terminology) is that Bernstein decided to switch from the "Agreed Plans" to the "Switched Plans" *after* agreeing to the Agreed Plans. Thus, plaintiff's Statement of Additional Uncontroverted Facts sets forth a sequence under which Bernstein "unilaterally replaced the Agreed Plans with plans for an inferior diner." (Resp. at 8). The plaintiff's Response is explicit: Bernstein (allegedly) took the Agreed Plans to Berry of Wilkins, was told the diner could not be build as provided for in the Agreed Plans, and directed Wilkins to substitute an inferior diner with lower costs. (Id. at 9). All of this occurred after the agreement which supposedly created the "Agreed Plans." Further, the additional allegation that Bernstein mislead Blair during the November 28, 2005 telephone conversation occurred after the March, 2005 adoption of the so-called "Agreed Plans."

Plaintiff has failed to provide clear and convincing evidence of any fraud actionable under Kansas law. In *Modern Air Conditioning v. Cinderella Homes*, 226 Kan. 70, 78, 596 P.2d 816 (1979), the court observed:

> An unjustified breach of contract does not entitle an opposing party to punitive damages; as a general rule, damages for breach of contract are limited to pecuniary loss sustained. *Hess v. Jarboe*, 201 Kan. 705, 443 P.2d 294 (1968). The mere statement by Ames that he would pay the liens and complete the construction was not a false representation of an existing and material fact, unless at the time the statement was made Ames had no intention of performing those promises. When alleged fraud relates to promises or statements concerning future events, the gravamen of such a claim is not the breach of the agreement to perform, but the fraudulent representation concerning a present, existing intention to perform, when such intention is in fact nonexistent. *Edwards v. Phillips Petroleum Co.*, 187 Kan. 656, 360 P.2d 23 (1961); and see PIK Civ.2d 14.41 (1977). Thus Ames' promise to perform, and his failure to do so, do not entitle Madsens to punitive damages, unless the evidence discloses that Ames did not intend to perform upon those promises at the time they were made; that the promise was made with intent to deceive Madsens and to induce them from

8

refraining to act; that Madsens reasonably relied upon the promises; and that they sustained damages thereby. The burden of proving fraud is by a preponderance of the evidence, but that evidence must be clear, convincing, and satisfactory. *Fox v. Wilson*, 211 Kan. 563, 579, 507 P.2d 252 (1973).

"A breach of contract action cannot be turned into an action for fraud by merely alleging reliance on representations that the contract would be performed and detriment from its breach." *Heller v. Martin*, 14 Kan.App.2d 48, 54-55, 782 P.2d 1241, 1245-46, (1989), *citing Brown v. Chaffee*, 612 F.2d 497, 503 (10th Cir.1979). Nonperformance under the terms of the contract is insufficient. Edwards v. Phillips Petroleum, 187 Kan. 656, 660, 360 P.2d 23, 26 (1961). Rather, the plaintiff must show by clear and convincing evidence an inference of fraudulent intent at the time of the making of the obligation. *Young v. Hecht*, 3 Kan. App.2d 510, 597 P.2d 682, 688 (1979). Thus, "[w]hen alleged fraud relates to promises or statements concerning future events, the gravamen of such a claim is not the breach of the agreement to perform, but the fraudulent representation concerning a present, existing intention to perform, when such intention is in fact nonexistent." *Mackey v. Burke*, 751 F.2d 322, 328 (10th Cir.1984) (*quoting Modern Air Conditioning*, 226 Kan. at 78, 596 P.2d at 824). Absent evidence that the representations in an agreement were intentionally untrue at the time of the original agreement, summary judgment as to a claim of fraud is appropriate. *See Rajala v. Allied Corp.*, 919 F.2d 610, 632 (10th Cir. 1990) (applying Kansas law).

The plaintiff has failed to show that Bernstein had the present intent in March of 2005 to substitute the supposedly inferior diner plans. Rather, the narrative of facts submitted to the court, read in the light most favorable to the plaintiff, indicates only that Bernstein attempted to switch plans after learning that the initial plans were unworkable or too costly. By plaintiff's own evidence, the defendants were already obliged in March of 2005 to provide the "Agreed Diner." That is, "Bernstein knew about the Agreed Plans, but *proceeded* to have the diner constructed with the Switched Plans." (Resp. at 10) (emphasis added). None of plaintiff's evidence shows an intent by Bernstein in March of 2005 to provide an inferior diner; all of its evidence is directed at showing

how and why Bernstein supposedly later attempted to switch the diner plans.  The court finds that summary judgment is appropriate as to the plaintiff's claims of fraud against Bernstein.

As noted earlier, there are several additional motions.  By its prior Order of December 17, 2008, the court determined that the defendants had no standing to advance the separate claims of Dinermite concepts, granted summary judgment as to the claims against third-party defendant Wilkins. The court also granted the motion to dismiss Diner Concepts as a party to the action.

The plaintiff Blair-Naughton has moved for reconsideration of the motion to dismiss Diner Concepts as a defendant.  The plaintiff correctly notes that the motion had been withdrawn.  (Dkt. No. 64). Accordingly, this portion of the court's ruling is withdrawn.

Also at issue is the validity of the renewed action against Wilkins presented by means of the new Amended Third Party Complaint.  This is the subject of the defendant Diner Concept's Motion for Reconsideration (Dkt. No. 126) as well as Wilkins's Motion to Strike (Dkt. No. 135). The court will deny the motion for reconsideration on the issue and will grant Wilkins's Motion to Strike.

The defendant's motion fails to articulate any grounds justifying such relief.  A motion to alter or amend under Fed. R. Civ. Pr. 59(e) may be granted to correct manifest errors of fact or law, or in light of newly discovered evidence.  *Buell v. Security Gen'l Life Ins. Co.*, 784 F.Supp. 1533, 1535 (D. Colo. 1992), *aff'd*, 987 F.2d 1467 (10th Cir. 1993), cert. denied, 114 S.Ct. 308 (1993).  A motion to alter or amend is directed not at initial consideration, but reconsideration.  *Buell*, 784 F.Supp. at 1535.   Such reconsideration is appropriate only if the court has obviously misapprehended a party's position, the facts, or applicable law, has mistakenly decided issues not presented for determination, or the moving party produces new evidence which it could not have obtained through the exercise of due diligence. *Anderson v. United Auto Workers*, 738 F.Supp. 441, 442 (D. Kan. 1989).  *Refrigeration Sales v. Mitchell-Jackson, Inc.*, 605 F.Supp. 6, 7 (N.D. Ill. 1983), *aff'd*, 770 F.2d 98 (7th Cir. 1985).  A motion to reconsider is not "a second chance for the losing party to make its strongest case or to dress up arguments that previously failed." *Voelkel v. GMC*, 846 F.Supp. 1482 (D.Kan.), *aff'd*, 43 F.3d 1484 (10th Cir. 1994).  The resolution of the motion is

committed to the sound discretion of the court. *Hancock v. City of Oklahoma City*, 857 F.2d 1394, 1395 (10th Cir. 1988).

Instead of attempting to show that the finding that Court's order of December 17, 2007, was founded on any manifest error of law or the facts, the defendant Diner Concepts argues that Wilkins's motion on the issue was rendered "moot" by the earlier order of the United States Magistrate Judge granting leave for the plaintiff to amend its claims, coupled with the hypothetical statement that such amendment "may obviate" the standing issue.

The court finds that such amendment should not be allowed. If defendant wished to advance a timely claim against Wilkins after the time for amendments has passed, Fed.R.Civ.Pr. 16(b) would have required a showing of good cause. It may not, in the absence of any such showing, evade the court's prior judgment (and add a new, implied indemnity claim) based upon the plaintiff's amended complaint, which, the plaintiff stressed, "would in no way expand discovery, or otherwise complicate the case." (Dkt. No. 103, at 2). Defendant has submitted no authority demonstrating that such claims may be advanced by amendment without first obtaining leave of the court, and certainly none in which a new complaint by a plaintiff has been held to be a legitimate pretext for the revival of new claims against third parties.

Defendant has not demonstrated any good cause for the delay in presenting the present claims or in failing to seek leave for their submission. Equally, as noted earlier, defendant has not demonstrated any of the traditional requirements for relief in a motion under Rule 59.

In its prior order of December 17, the court determined that the putative, after-the-fact "assignment" of claims between Diner Concepts and Dinermite was ineffective to provide standing for defendant's third-party claims. The ruling was the judgment of the court, and the defendant has not demonstrated any entitlement to relief from the ruling. Nor can that judgment be evaded by through the expediency of filing an Amended Answer which repeats and adds to the dismissed claims, coupled with a motion which fails to meet the standards set forth by Rule 59.

11

IT IS ACCORDINGLY ORDERED this 28th day of March, 2008, that the third-party defendant's Motion to Strike (Dkt. No. 135), plaintiff's Motion to Reconsider (Dkt. No. 120) and defendant Bernstein's Motion for Summary Judgment (Dkt. No. 109) are hereby granted; defendant's Motion for Reconsideration (Dkt. No. 126) is denied.

s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE