IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

BLAIR-NAUGHTON, L.L.C., d/b/a
GOODLAND STEAKHOUSE DINER,

Plaintiff,

vs.                                                    Case No. 06-1183-JTM

DINER CONCEPTS, INC., and
DINERMITE DINERS, INC., Georgia
Corporations, DAVID H. BERNSTEIN, and
DIANE BERNSTEIN,

Defendants.

MEMORANDUM AND ORDER

This matter is before the court on the defendant Diane Bernstein's Motion to Dismiss (Dkt.

No. 150). Because both defendant and plaintiff Blair-Naughton both rely heavily on evidentiary

matters outside the pleadings, the court will resolve the motion as one for summary judgment.

Summary judgment is proper where the pleadings, depositions, answers to interrogatories,

and admissions on file, together with affidavits, if any, show there is no genuine issue as to any

material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P.

56(c). In considering a motion for summary judgment, the court must examine all evidence in a

light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th

Cir. 1988). The party moving for summary judgment must demonstrate its entitlement to summary

judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir.

1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual

allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d

1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere

allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come

forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

Plaintiff, Blair-Naughton, L.L.C. Blair-Naughton, is, and at all times relevant has been, a Kansas limited liability company headquartered in Goodland, Kansas (the founding members were Thomas W. Blair and Brian W. Naughton).

Defendant Diner Concepts, Inc., is, and at all times relevant has been, a Georgia corporation headquartered in Atlanta, Georgia. Defendant Dinermite Diners, Inc. Dinermite is, and at all times relevant has been, a Georgia corporation headquartered in Atlanta, Georgia. David Bernstein is, and at all times relevant has been, a director, the President and CEO of Diner Concepts and Dinermite, and is, and at all times relevant has been, a resident of Marietta, Georgia. Diane Bernstein is, and at all times relevant has been, a director, the Secretary and/or Secretary-Treasurer and/or the CFO of Diner Concepts and Dinermite, and is, and at all times relevant has been, a resident of Marietta, Georgia.

On March 23, 2005, Blair-Naughton and Diner Concepts entered into a Sales Contract, under which Diner Concepts agreed to sell to Blair-Naughton a "modular" diner structure. The diner would be constructed by a manufacturer "designated" by Diner Concepts. The purchase price for the diner,

including an installed kitchen equipment package, "delivery charges" and the cost of "placement of [the] unit onto Purchaser's footings/foundation at their own prepared site/location," was $537,500.00. (Def. Exh. 8, at BN00087).

The purchase price was to be paid in five installments: $25,000.00 upon execution of the Sales Contract; $163,175.00 within ten days of "receipt of Approval Plans" for the diner; $134,350.00 within ten days of the point in time "25% of construction" of the diner was completed by the manufacturer; $134,350.00 within ten days of the point in time "50% of construction" of the diner was completed; and, a final payment of $80,625.00 within ten days of "completion of factory construction prior to shipment to Purchaser's site."

Blair-Naughton made the first payment under the Sales Contract, in the amount of $25,000.00, by means of a cashier's check in the same amount, dated March 21, 2005, made payable to Diner Concepts, drawn on a bank account maintained by Blair-Naughton with the First National Bank of Goodland, Kansas. This cashier's check was deposited into a bank account maintained by Diner Concepts with Bank of America in Atlanta, Georgia, on March 23, 2005. Blair-Naughton made the second payment on June 24, 2005, by another cashier's check. Although made payable to Dinermite, the check was deposited into a bank account maintained by Diner Concepts with Bank of America in Atlanta, on June 27, 2005. It made the third and fourth payments on November 16, 2005, paying one combined lump sum of $268,700.00 by a wire transfer from the First National Bank of Goodland to Dinermite's account in Atlanta. By a similar wire transfer, Blair-Naughton made the fifth and final payment of $80,625.00 on January 4, 2006.

Except for the period at or around the time of its formation, Diner Concepts kept no minutes of meetings of shareholders, officers or directors. Diner Concepts did not file separate tax returns for the years 2002 or thereafter; it filed returns in combination with Dinermite. In its correspondence, frequently it did not use any distinctive Diner Concepts letterhead. Its financial records for the period beginning January 1, 2002 are limited to the records from two Atlanta Bank of America accounts. Diane Bernstein testified that her husband operated Diner Concepts out of the

offices of Dinermite, that she was not aware of any assets owned by Diner Concepts, and not aware of any employees of Diner Concepts.

The diner sold to Blair-Naughton was the only diner ever sold by Diner Concepts.

Blair-Naughton alleges that, without its knowledge, David Bernstein arranged for Wilkins Builders to construct a different, inferior diner to that which it had agreed to.

On August 10, 2005, Dinermite, acting through David Bernstein, entered into a written agreement with Wilkins Mobile Builders, Inc. of Double Springs, Alabama, to manufacture the diner structure, for a purchase price of $232,410.00. The Wilkins Contract provided that the purchase price was to be paid by Dinermite to Wilkins Builders by means of an initial payment of 25%, with the balance to be paid upon completion of construction. Dinermite made the initial 25% payment, in the amount of $58,102.00, by means of a check dated August 9, 2005.

On September 21, 2005, Dinermite entered into a contract with Ballentine Equipment Co., Inc. of Greenville, South Carolina, for the kitchen equipment package for the Blair-Naughton diner. The Ballentine Contract provided that the purchase price of $110,199.04 (which included delivery and installation) was to be paid by Dinermite by means of an initial payment of 25% of the purchase price upon execution of the Ballentine Contract, with the balance to be paid upon installation of the kitchen equipment package. Dinermite made the initial 25% payment ($27,549.76), by means of a check dated September 21, 2005.

Diner Concepts made the second and final payment due to Wilkins Builders by means of a cashier's check in the amount of $157,307.50 drawn on its Atlanta account. The difference between the total amounts in the contract ($232,410) and the amount actually paid to Wilkins Builders ($215,409.50) is explained by the fact the Wilkins Contract provided for a future "credit" to Dinermite relative to the actual cost of exterior stainless steel materials, which credit was estimated at approximately $17,000.00 at the time the Wilkins Contract was entered into on August 10, 2005, and which credit was actually granted in the exact amount of $17,000.00 (as Metalworks, another company, provided and installed the stainless steel, as noted below), leaving a final balance of

4

$157,308.00 owed to Wilkins Builders. For whatever reason, the final payment ($157,307.50) to Wilkins Builders by Diner Concepts was $0.50 short.

The completed diner structure modules manufactured by Wilkins Builders were delivered to Blair-Naughton's site in Goodland, on or about January 20, 2006. Bennett Truck Transport, L.L.C. of McDonough, Georgia, hauled these modules to Goodland.  Bennett's  adjusted charge for hauling the modules from  Double Springs, Alabama, to Goodland, was $8,156.00 paid by means of a check dated February 10, 2006.

Dinermite made the second and final payment due to Ballentine Equipment, for the kitchen equipment package, in the amount of $82,649.28, by means of a cashier's check dated March 17, 2006.

EZ Erectors was paid $5,240.00 for assembling and erecting the diner modules by  cashier's check in that amount dated January 20, 2006. An additional $4,500.00 was paid to EZ Erectors by check dated February 8, 2006. This was a payment for EZ Erectors' crew's "down time" before the diner structure modules arrived in Goodland, caused by Bennett Transport's late arrival with the modules.

Dinermite entered into a written agreement with Bowman's Heating & A/C of Goodland, Kansas, to supply and install four roof-top air conditioning units and roof curbs, hook up the air conditioning equipment to the diner's duct work, hook up the refrigeration equipment and exhaust fans, etc., for which Bowman charged a total of $25,500.00. This amount was paid in three installments:  an up-front payment of $12,750.00 by cashier's check on January 31, 2006, a second cashier's check, for $6,375.00 on March 3, 2006, and a third payment by check for $6,375.00 on April 11, 2006. An additional sum of  $1,200.00 was paid by cashier's check dated March 9, 2006, to Bowman for supplemental duct work, pursuant to a separate bid submitted to Dinermite and resulting invoice for the work performed.

Bowman performed more work, reflected in three invoices submitted to Dinermite—all dated May 15, 2006—which became the subject of a dispute between Dinermite and Bowman. On July 12, 2006, Bowman filed a Petition in the District Court of Sherman County, Kansas (Case No. 06SC14), against Dinermite and David Bernstein, seeking $3,520.00 for the additional work. The case was resolved when Dinermite paid the sum Bowman claimed, by means of two checks: the first check, dated September 11, 2006, in the amount of $1,500.00, and the second check, dated September 28, 2006, in the amount of $2,070.00. A Journal Entry dismissing Bowman's suit, with prejudice, was filed on October 30, 2006.

The fabrication and installation of the galvanized mansard roof frame, equipment screens, and exterior fascia—gloss white and stainless steel—was performed by Whitney Wholesale & Metalworks, Inc., of Shawnee, Kansas, which charged a total of $38,152.50 (pursuant to two separate contracts, one for $25,000.00, and the other for $13,152.50). The total amount indicated—$38,152.50—was paid to Metalworks in three installments. The first installment on the first contract, was deposited in a bank account maintained by Metalworks with Gold Bank of Shawnee, Kansas, on February 6, 2006, in the amount of $12,500.00. The second payment, representing the balance due on the first contract, in the amount of $12,500.00, was made by means of a check, dated April 11, 2006. The third payment, which satisfied the amount due on the second contract, in the amount of $13,152.50, was made by means of a check, dated April 20, 2006.

William Lynch of William & Sons of Harlem, Georgia, performed additional punch list-type work. William & Sons was paid $750.00 by check, dated February 8, 2006. McClure Plumbing & Heating, Inc., of Goodland, Kansas was paid $735.00 by check dated April 11, 2006, for lowering the floor drains to floor level, including materials and labor. WW Contracting of Goodland, Kansas, was paid $3,106.83, by check, dated April 11, 2006, for "labor" and "materials" for "work on diner . . . up till March 18th [2006]". WW Contracting was paid another $1,792.00, by means of a check, dated April 25, 2006, for "labor and materials for work on kitchen ceiling" and "insulation and membrane on exterior of diner."

6

Dinermite's checks to all of these contractors – Wilkins Builders, Ballentine Equipment, Bennett Truck Transport, EZ Erectors, Bowman's Heating, Whitney Wholesale & Metalworks, William & Sons, and McClure Plumbing & Heating – were drawn on its Atlanta account.

Diane Bernstein's deposition was taken in Atlanta, on July 23, 2007, pursuant to a nonduces tecum notice to take deposition served on her at her home in Marietta on July 18, 2007 (Dkt. No. 55; Dkt. No. 63), before she was made a defendant pursuant to Blair-Naughton's First Amended Complaint filed November 28, 2007. Diane Bernstein's deposition consists of 36 pages.

With the exception of one question put to Diane Bernstein by counsel for Wilkins Builders—whether Diane Bernstein had "ever had any communications with anyone from Wilkins Builders", to which she responded in the negative—all of the questions put to her were asked by Blair-Naughton's lead counsel, who asked about her level of involvement in Diner Concepts. Diane Bernstein testified that while she understood that her husband, David Bernstein, had appointed her as an officer in the company, the Secretary-Treasurer, it was her understanding she had been so appointed "on paper" in the event something happened to her husband; that "when David got sick—the whole purpose for me being on those companies as whatever I mean—an officer or whatever—and being able to sign the checks is because of David's age and because in 2003 he got sick," and that "was to enable the company to keep going and for us to keep doing whatever we do while he couldn't go to the office"; that she "did sign checks for Dinermite then, and I do now—not exclusively", as "David signs checks too." She agreed with Mr. Peterson that she had not been in "any meetings of Diner Concepts"; that she did not "know anything about Diner Concepts"; that Diner Concepts was her husband's company; and, that her husband "doesn't mess with my companies, and I don't mess with his."

Counsel asked Diane Bernstein a few questions about certain aspects of the subject transaction with Blair-Naughton, that is, why an architect was hired by Dinermite to draft a set

of plans rather than Diner Concepts hiring the architect, and why the Wilkins Contract was entered into by Dinermite rather than by Diner Concepts, with Diane Bernstein answering that she did not know the answer to either question.

Counsel also asked Diane Bernstein "what happened" to the "$537,000" which was paid by Blair-Naughton pursuant to the Sales Contract, and she responded, "I don't know . . . I don't have anything to do with that." As whether she knew how much money Diner Concepts had in its bank accounts at the time of her deposition, she responded that she had "no idea" because she had not "seen the checkbook." Counsel then asked Diane Bernstein whether it was a "fair statement" that she did "not know whether Diner Concepts had adequate funds to conduct business operations in 2005," and she responded she did not know one way or the other. Counsel did not ask Diane Bernstein any questions about whether she had any communications with any of Blair-Naughton's representatives, any of the subcontractors, or anyone else involved in the subject transaction.

The deposition of Bernard E. "Pete" Whelan  was taken by counsel for the "original" defendants Diner Concepts and David Bernstein, on August 30, 2007, in Goodland, Kansas. A trust owned by Whelan's wife sold the land on which the diner sits.  Whelan was an attorney who was involved in assisting Blair-Naughton in the diner transaction. He surrendered his license on October 17, 2005, and was disbarred by order of the Kansas Supreme Court dated October 25, 2005.

Whelan was asked  whether he ever "met" with, "talked to", or received "any letter" from Diane Bernstein, to which he responded in the negative. In this connection, Mr. Whelan testified he recalled speaking by phone with a "female" in David Bernstein's office in Atlanta, adding he didn't "know whether [she] was his secretary or his wife," but that in any case he and the female with whom he spoke by phone in David Bernstein's office in Atlanta "never talked business."

The deposition of Thomas Blair was held on August 3, 2007.[1]  Blair agreed with counsel's observation that Blair had never spoken with "anyone else who said that they were involved with

---

[1]Brian Naughton, the other member of Blair-Naughton, was never deposed. He died in an accident on July 21, 2005.

representing or employed by either Diner Concepts or Dinermite" other than David Bernstein and another individual who worked with those companies, Don Memberg. Blair further testified he never met Diane Bernstein, and agreed that he didn't have "any information that she was involved in the business."

Don Memberg, who worked with David Bernstein from October of 1998 to September of 2005, was deposed by Blair-Naughton counsel in Atlanta, Georgia, on May 21, 2007. In relevant part, with respect to the activities and involvement of Diane Bernstein in Diner Concepts or Dinermite, Memberg testified he understood that David and Diane Bernstein were the "principals" involved in Diner Concepts and Dinermite; that there were "only three people that worked for that company," being "the secretary, Mr. Bernstein, and myself"; that "towards the end before I left [in September of 2005]", she [Diane Bernstein] wrote all the checks or wrote most of the checks; and when we needed something, I would tell "Mr. Bernstein—like for a vendor or he was doing that—he would ask her to take care of that"; that "when Mr. Bernstein was in the hospital, [he] told [Memberg] that Diane was an officer of the corporation and could sign contracts and checks"; that Diane Bernstein "used to meet with [David Bernstein] in the hospital sometimes also because there was a problem at that time with the Pensacola deal that she and him would get together and pay bills and do things"; that Diane Bernstein "basically wrote the checks and, you know, watched what was going on"; that when David Bernstein was in the hospital, in "like 2003, 2004", Mr. Memberg and Diane Bernstein "went through checks that were just thrown in a pile basically in envelopes," that "weren't in any logical order"; that at Diner Concepts' and Dinermite's shared office, in Atlanta, Diane Bernstein "had a place where she could work, and she had stuff in there"; that Diane Bernstein "at times" would come into the office for "five minutes or so" but "most of the work she did, she picked up; and she worked from her home"; that when David Bernstein was in the hospital Diane Bernstein "worked in his office because she went through his office and straightened out his office and threw out a lot of old magazines and stuff and tried to fix up his desk and tried to organize his office and other parts of the office while he was out"; that David Bernstein told him that the

corporate checkbooks were "at home with [Diane Bernstein]" and that she "cut the checks"; and, that when Dinermite and Diner Concepts first moved to the "new office", Diane Bernstein "did come in in the beginning; and then it got less and less over the initial time we were there", testifying he thought at the time of his deposition that the companies had occupied the new office for "three or four" years.

Counsel for Blair- Naughton took David Bernstein's deposition in Atlanta on May 22, 2007. With respect to his wife, David Bernstein testified she was an officer, but "[o]nly in actuality, because at that time I was told by the attorney you had—that you had to have two officers recorded to be registered in the state of Georgia"; that "she's never had any active part" in the business; that she "would write the checks" when he "was unable to", during periods he was in the hospital; that while he was in the hospital she "came in a short period of time each day—normally a half an hour" during which time Mr. Memberg "would give her invoices, bills, whatever"; and, that when he "got more stable" in the hospital she "would bring the checkbook to the hospital; and I would write them right out of my sick bed."

Prior to the date she was subpoenaed for her deposition in this matter, which subpoena was served on her in Marietta, Georgia, on July 18, 2007, Diane Bernstein never had any communication, either by letter, fax, e-mail, telephone, or otherwise, with Thomas Blair, Brian Naughton, or any representative of Blair-Naughton; nor, prior to that date, had she directed any other person to engage in any communication, either by letter, fax, e-mail, telephone, or face-to-face contact, with Thomas Blair, Brian Naughton, or any representative of Blair-Naughton.

Diane Bernstein has never conducted any personal business in the State of Kansas, and she has no contacts with Kansas, except as described here–writing five checks to Kansas vendors or subcontractors for work on the diner which is the subject of this action. She wrote those checks

strictly in her capacity as an officer of Dinermite, at the direction of David Bernstein, President of Dinermite. Those checks, which she wrote to the Kansas vendors/subcontractors, David Bernstein then took and mailed from Atlanta, Georgia, to the vendors/subcontractors in Kansas.

Diane Bernstein's only involvement in the performance of the Sales Contract of March 23, 2005, was in writing the five checks mentioned above:

| Date | Payee | Amount |
|------|-------|--------|
| April 22, 2006 | Bowman | $6,375.00 |
| April 11, 2006 | Metalworks | 12,500.00 |
| April 11, 2006 | McClure Plumbing | 735.00 |
| April 11, 2006 | WW Contracting | 3,106.83 |
| April 25, 2006 | WW Contracting | 1,792.00 |

As noted above, Diane Bernstein wrote the checks at her home in Marietta, Georgia; David Bernstein mailed the checks to Kansas.

Neither Dinermite or Diner Concepts has ever entered into any agreement to purchase any goods or services from Blair-Naughton. Blair-Naughton has never obtained any judgment in a court of law against Dinermite or Diner Concepts.

Pursuant to this Court's Memorandum and Order of November 28, 2007, (Dkt. 113), plaintiff's First Amended Complaint—adding Diane Bernstein as a "new" defendant—was filed November 28, 2007. (Dkt. No. 114).

On January 28, 2008, Defendants' Answer to Plaintiff's First Amended Complaint was filed. (Dkt. No. 114). In the Answer, with respect to the "Breach of Fiduciary Duties" claim asserted against "new defendant Diane Bernstein, she admitted she was an officer of Diner Concepts, denied all other allegations, and asserted her Affirmative Defenses, including, inter alia, that this Court lacks personal jurisdiction over her, that venue is not properly established as to the claim made against her, and that Blair-Naughton failed to state a claim against her for which relief can be granted. (Dkt. No. 134).

**Conclusions of Law**

Defendant Diane Bernstein presents two arguments in her dispositive motion.  First, that the breach of trust allegation against her is without merit; and second, that the court is without jurisdiction over her.

Although the parties devote most of their attention to the question of the merits of the substantive claim against defendant, the court must first resolve the question of personal jurisdiction. Diane Bernstein alleges that personal jurisdiction is not present, citing the decision of *Schlatter v. Mo-Comm Futures, Ltd.*, 233 Kan. 324, 662 P.2d 553 (1983).  In Schlatter, the court determined that K.S.A. 60-308(b)(6) did not create personal jurisdiction over the nonresident directors of a Missouri corporation who were not involved in directing the corporation's business, and were not involved in the alleged fraud of the corporation.  Under *Schlatter*, the statute "requires something more than a failure to act on the part of a nonresident director of a Missouri corporation. [I]f the legislature had intended that mere membership on the board of directors (of an out of state corporation) was sufficient to subject a corporate director to Kansas jurisdiction for tortious acts of the corporation, it could easily have said so." *Anderson v. Heartland Oil & Gas*, 249 Kan. 458, 819 P.2d 1192, 1197 (1991) (discussing *Schlatter*).

The plaintiff acknowledges *Schlatter* but contends a different result obtains because Diane Bernstein did more than simply serve as officer and director of Diner Concepts:  she also submitted checks to Kansas. The plaintiff has the burden of proving personal jurisdiction over a defendant. *Fed. Deposit Ins. Corp. v. Oaklawn Apartments*, 959 F.2d 170, 174 (10th Cir.1992).  This requires a two-fold analysis:  whether the defendant's conduct falls within the Kansas long-arm statute, Kan. Stat. Ann. § 60-308, and whether the exercise of jurisdiction is consistent with due process. *See Equifax Servs. v. Hitz*, 905 F.2d 1355, 1357 (10th Cir.1990).

The court believes that *Schlatter* precludes application of Kansas long-arm jurisdiction over Diane Berstein. In *Schlatter*, as here, the plaintiff alleged non-feasance on the part of the non-

12

resident corporate officer:  The Kansas Supreme Court agreed that the alleged "total failure to assume any of the duties of a director [of the limited partnership] may constitute a breach of their fiduciary duty to the corporation and its stockholder, such nonfeasance in office cannot be the basis of subjecting them to *in personam* jurisdiction in Kansas solely because the corporation transacted business or committed tortious acts in Kansas." *Schlatter*, 233 Kan. at 337. "Jurisdiction over officers of a corporation must be based on their individual contacts with the forum state." *Strasburg-Jarvis, Inc. v. Radiant Systems*, No. 06-2552-CM, 2008 WL 627486, at *3 (D. Kan. March 4, 2008) (*citing Ten Mile Indus. Park v. W. Plains Serv. Corp.*, 810 F.2d 1518, 1527 (10th Cir.1987).

The five checks signed by Diane Bernstein do not alter this result.  It is uncontroverted that the checks were signed by Bernstein at her home in Georgia.  It is also uncontroverted that the checks were mailed to Kansas not by Diane but by David Bernstein.  It is uncontroverted that Diane Bernstein knew essentially nothing about the business of Diner Concepts.  The plaintiff has acknowledged that they are not asserting that Diane Bernstein knew of and actively participated in the alleged fraud in which the diner design was downgraded.  In comparison to the lengthy period during which the diner was manufactured and installed, the checks in question were written within one short period of time. Compared to the total purchase price of diner, the five checks were for a small fraction of the diner purchase price. There is nothing even to show that Diane Bernstein knew the checks would be mailed to Kansas. The court finds that these contacts, extremely limited in scope and unrelated to the basic claim of breach of trust, fail to authorize any application of jurisdiction pursuant to the Kansas long-arm statute.

Even if the court were to find personal jurisdiction over Diane Bernstein, summary judgment would remain appropriate. Diane Bernstein argues that the plaintiff's claim against her reflects an application of the historic (if not archaic) "trust fund doctrine," under which the directors or officers of an insolvent corporation are deemed to be trustees for the Corporation's creditors.  Bernstein argues that, pursuant to *Ling v. Jan's Liquors*, 237 Kan. 629, 634–35, 703 P.2d 731 (1985), Kansas would apply its own law to the issue of whether a valid claim is advanced here, because the injury

occurred in Kansas.  She further argues that Kansas has rejected imposing liability under such circumstances in *Speer v. Dighton Grain*, 229 Kan. 272, 629 P.2d 952 (1981). She further stresses that Kansas statutory law bars actions against the officers of a corporation without first obtaining judgment against that corporation.  K.S.A. 17-7101(b).

Blair-Naughton does not attempt to argue that the present action would survive if the court were to apply Kansas law.  Rather, it is that *Ling* is inapplicable because that case dealt with a question of common law negligence liability.  Instead, Blair-Naughton argues that its claim against Diner Concepts is grounded on her failure to perform certain obligations as an officer of a Georgia corporation, and that as a result the law of that state applies, since the case involves a question of corporate governance.  *See Loveridge v. Dreagoux*, 678 F.2d 870, 878 (10th Cir. 1982); *Wilshire Oil Co. v. Riffe*, 409 F.2d 1277, 1283 (10th Cir. 1969).  Blair-Naughton, argues that the present action presents an actionable claim for corporate breach of trust under Georgia law, citing *Bank Leumi-Le-Israel, B.M., Philadelphia Branch v. Sunbelt Indus., Inc*., 485 F. Supp. 556, 559 (S. D. Ga. 1980),  *citing Super Valu Stores, Inc. v. First National Bank of Columbus*, 463 F. Supp. 1183 (M. D. Ga. 1979).

In this context, the plaintiff notes the observation by the Georgia Supreme Court nearly a century ago in *McEwen v. Kelly*, 79 S.E. 777, 779 (Ga. 1913):

> In a solvent, going concern, directors are the agents or fiduciaries of the corporation, not of its creditors. But directors are not wholly without duties to creditors. They cannot misappropriate the corporate assets or give them away, so that creditors are prevented from collecting their debts; and under some circumstances a trust or quasi trust relationship exists towards creditors. Thus it has often been held that in cases of insolvency all of the assets are applicable to the payment of debts and are not for distribution among stockholders, and that accordingly the directors stand in a trust relation toward creditors. In cases where, aside from statutory provisions, creditors have been held to have a right to sue directors on account of losses arising from misconduct or negligence, sometimes the decision has been based on the theory of a trust or quasi trust relationship, and sometimes on the idea that the liability of the directors to the corporation was an equitable asset, which the creditors might subject, if necessary.

14

*See also Ware v. Rankin*, 104 S.E.2d 555, 558 (Ga. Ct. App. 1958) ("noting that "[d]irectors and managers of insolvent Corporations are trustees of the funds, as well for the creditors as for the corporation").

In this context, "insolvency is defined generally as the inability of a corporation to pay its debts as they become due in the usual course of business." *Kelly Energy Systems, Inc. v. Board of Comm'rs of Clark County*, 196 Ga.App. 519, 520, 396 S.E.2d 498 (1990).

There is no evidence of insolvency here.  The evidence in fact shows that Diner Concepts was in fact paying its actual creditors (Wilkins Builders, Ballentine Equipment, Bennett Truck Transport, EZ Erectors, Bowman's Heating, Whitney Wholesale & Metalworks, William & Sons, and McClure Plumbing & Heating) as those parties submitted requests for payment in the normal course of business.

Plaintiff, however, seeks to add itself to this list, by arguing both that it was a creditor of Diner Concepts, and that Diner Concepts' debt arose in August of 2005 when the plans for the diner were altered.  But the fact remains that Blair-Naughton did not supply any services or goods to Diner Concepts "in the normal course of business." Even now, it has only a hope or expectancy of some future judgment against Diner Concepts.   In 2005, it did not even have that, since it was then allegedly unaware of the substituted diner design.

The court finds that Kansas would apply its own law to the present action. The cases cited by Blair-Naughton are not controlling.  *See Loveridge v. Dreagoux*, 678 F.2d 870, 878 (10th Cir. 1982); *Wilshire Oil Co. v. Riffe*, 409 F.2d 1277, 1283 (10th Cir. 1969). In *Loveridge*, the court generally observed that "[w]e are not unaware of the rule that the internal affairs of the corporation, such as the relationship of the officers and directors to the corporation, are governed by the state of incorporation." 678 F.2d at 878, citing *Restatement (Second) of Conflict of Laws*, § 309 (1969). However, the court refused to apply the law of the place of incorporation, because the action did not

15

involve solely a matter of corporate governance: "In this case the validity of the corporation arises in the context of fraud and misrepresentations made to third parties. Thus, it was not an internal matter." *Id.*

*Wilshire Oil* is similarly inapposite. The case involved an action by a Delaware corporation against three former employees, seeking to recover as damages antitrust penalties imposed on the corporation due the actions of the former employees. The plaintiff's claim is based upon the theory that the defendant's nonfeasance constitutes a violation of the fiduciary duty owed to the corporation. "As such, this is a claim involving the internal affairs of a foreign corporation and clearly justifies the utilization of the concomitant choice-of-law rule." 409 F.2d at 1283.

The present action, of course, does not involve a claim by a corporation against its officers or employees, or some other purely internal challenge to the affairs of the corporation. Rather, it is an action against a Georgia corporation by a third person - neither officer, director, nor shareholder of the corporation - located in Kansas, allegedly injured as a result of the tortious acts by the foreign corporation. The plaintiff has pointed to no authority which would suggest that under these circumstances Kansas would displace the general rule of *Ling*, that the law of the place where the injury occurred should govern, and instead would apply Georgia law rather than its own.

As noted earlier, plaintiff makes no argument that its action against Diane Bernstein would survive under Kansas law, in the face of *Speer* and K.S.A. 17-7101(b).[2]  Accordingly, the

---

[2] K.S.A. 17-7101(b) provides:

No suit shall be brought against any officer, director or stockholder for any debt of a corporation of which he is an officer, director or stockholder, until judgment be obtained therefor against the corporation and execution thereon returned unsatisfied.

Courts have recognized exceptions to the statute, such as claims that an officer hasl participated in a fraud against the plaintiff. *Gardner v. Enviro Technologies, Inc.*, No. 05-02129 2005 WL 1993453 (D.Kan. Aug. 17, 2005). None of these exceptions is applicable here, however, and plaintiff as explicitly acknowledged that it is not alleging that Diane Bernstein was involved in the alleged fraud under which the diner design was altered.

determination that Kansas law governs is dispositive.  However, the court would note further that even if it applied Georgia law, the present claim should be dismissed.

The leading case from Georgia, *Super Valu Stores v. First National Bank*, 463 F.Supp. 1183 (M.D.Ga.1979), not only fails to lend support for a direct action against Diane Bernstein, the case actively counsels against it:

> The plaintiff in its own behalf seeks to hold the estate liable for Roberts' alleged negligent mismanagement of Consolidated. It is true that an officer or a director, even an inactive one, owes a fiduciary duty of good faith and due care to the corporation. *See Woodward v. Stewart*, 149 Ga. 620, 101 S.E. 749 (1919); *McEwen v. Kelly*, 140 Ga. 720, 79 S.E. 777 (1913); Ga.Code Ann. § 22-713. In some cases a judgment creditor may maintain an action for a breach of the duty; however, in the first instance, the duty is one owed to the corporation which possesses the cause of action for breach of that duty.
>
> In general an action for mismanagement against corporate fiduciaries should be brought by the corporation or for its benefit and not by a single creditor in its own behalf. *See Sutton v. Reagan & Gee*, 405 S.W.2d 828 (Tex.Civ.App.1966); 3A Fletcher *Cyclopedia Corp.*, § 1181 (1975); 19 Am.Jur.2d *Corporations* § 1350 (1965). While Georgia has never explicitly adopted this view, it represents the better reasoned rule since it avoids the possibility of double liability on the director or officer. *See Sutton v. Reagan & Gee*, *supra*. Therefore, Super Valu is not the proper party to bring this action.
>
> The cases cited by the plaintiff do not support its right to pursue this claim in its own behalf. Those cases which plaintiff contends allow a creditor to bring a direct suit against an officer or director for mismanagement were actually brought by representatives of the corporation. *See McEwen v. Kelly, supra*. (Action by trustee in bankruptcy for benefit of corporation); *Woodward v. Stewart*, *supra*. (Action by receiver of insolvent corporation).

463 F.Supp. at 1196 (footnote omitted).

Blair-Naughton acknowledges this language is unhelpful, but suggests a different result is compelled because of "[t]he unique circumstances of the current case." But the only circumstance it points to is that Blair-Naughton is the only creditor of Diner Concepts advancing any claim against the corporation.  There is nothing in *Super Valu* to suggest that it is merely the number of creditors seeking to impose personal liability against a corporate officer or director which is dispositive. Rather, in *Super Valu* the point was the that creditor-plaintiff, whether one or more in number, had not first obtained judgment against the corporation.  The policy underlying the limitation recognized in *Super Valu*, in short, is the same as that underlying the public policy recognized in Kansas in

*Speer* and in K.S.A. 17-7101(b) – namely, that it would work an unacceptable revolution in the field of corporate governance for the third persons to advance direct personal liability claims against the officers or directors of a corporation without some additional safeguard, such as the requirement that such claims first be rendered to judgment.

IT IS ACCORDINGLY ORDERED this 17th day of July, 2008 that the defendant's Motion to Dismiss (Dkt. No. 150) is granted as provided herein.


 s/ J. Thomas Marten
J. THOMAS MARTEN, JUDGE

18