IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

BLAIR-NAUGHTON, L.L.C., d/b/a
GOODLAND STEAKHOUSE DINER,

    Plaintiff,

vs.

DINER CONCEPTS, INC., and
DINERMITE DINERS, INC., Georgia
Corporations, DAVID H. BERNSTEIN, and
DIANE BERNSTEIN,

    Defendants.

Case No. 06-1183-JTM

MEMORANDUM AND ORDER

This matter is before the court on the defendants' Motion to Exclude the proposed expert testimony of Thomas Blair and Gary Poore relating to the lost profits of the plaintiff.

Blair has been in the restaurant business for seven years. He has operated a sports bar/restaurant in Benkleman, Nebraska and a hot dog stand in Colorado. He is a high school graduate. He has attended three Hipp Wholesale Food Conventions and Seminars, which covered topics such as pricing, marketing, and "foods for profit in restaurant operations." Blair has testified that he believes the restaurant should have had a net income of $2500 to $3000 per day, or gross profits (at a profit rate of 30%) of about $100,000 per year.

Blair has stated that he began making projections for the Goodland Steakhouse Diner in 2003, when he first began planning to open a restaurant and bar in Goodland, Kansas. His projections were based on three factors. First, the projections were based on traffic counts for Interstate 70 and Highway 27, which were the main highways adjacent to the projected cite of the restaurant. Second, Blair studied the percentage and number of people in the Goodland area who ate at restaurants similar to the diner. Third, he incorporated projected costs of land, building, and

improvements into consideration to arrive at his overall projections for earnings of the diner.

In support of Blair's testimony, the plaintiff has submitted an unattested, handwritten document submitted by Blair to counsel for plaintiff. The document states the conclusion:

> AS FAR AS MY OPINION OF PROJECTED INCOME FOR A SUCCESSFUL DINER IN GOODLAND KS, WE STUDIED TRAFFIC COUNTS, DEMOGRAPHICS, LAND & BUILDING COSTS, AND IMPROVEMENTS, IE PARKING LOT AREA – STARKING REPORT – EXTERIOR LIGHTS, SIDEWALKS, AND SIGNAGE.

(Dkt. No. 147, Exh. C at 2). The document does not include any of the underlying data. It does not state how calculations were performed.

> In his deposition, Blair was asked how he went about deciding to open a diner in Goodland: We got traffic counts, the Community Development Center helped us get traffic counts as far as Interstate 70, Highway 27. We did demographics, we did population count based on percentage of people that went to other restaurants who would come to our restaurant. We put that all together, basically submitted it to the bank, First National Bank, and that's how it got started.

(Blair dep. at 13).

His prior restaurant experience does not appear to extend to opening any restaurants. The restaurant with which he was primarily associated with, the sports bar in Benkleman, Nebraska, was an existing business which he purchased from his brother. (Blair dep. at 9).

Gary Poore is a Certified Public Accountant. Poore reviewed Blair's profits calculations, as well as projections by third-party lenders, such as the Small Business Administration. These third party calculations were lower than Blair's. Poore has stated that these projections show the diner should have earned $3100 per month in the ten months between its scheduled (August 1, 2005) and its actual (June 6, 2006) opening. Reviewing the SBA's calculations and the records of the diner after it opened, Poore believes the diner has lost $176,015.68, when it should have made a profit of $37,168. As a result, he believes that the diner lost earnings of $213,183.68 from the date of opening until May 31, 2007. After closing on June 30, 2007, Poore believes that the plaintiff will lose approximately $37,168 annually.

In their motion to exclude the testimony of Blair and Poole, the defendants acknowledge that Blair may have the knowledge, experience, and training to operate a restaurant, but he has not been shown to have any such knowledge, experience, or training which would qualify him to reasonably calculate the projected net income of a new type of restaurant located in a new market. They argue that his calculations are not reliable, but are mere speculation, and stress that lost profits cannot be recovered for a new business under Georgia law. The defendants seek to exclude Poole's testimony on the grounds that his calculations are wholly dependent on Blair's allegedly unreliable calculations. Finally, they argue that the plaintiff's lost profits calculations are additionally unreliable because those figures all fail to account for other factors which might have contributed to the reduced profits, rather than merely assuming that all of the blame must lie with the defendants.

In its response, the plaintiff argues that it need not show any valid methodology pursuant to *Daubert v. Merrell Dow Pharmaceuticals,* 309 U.S. 579, 592 (1993), because it is relying on the knowledge and experience of Blair in the restaurant business, citing *Bitler v. A.O. Smith Corp*., 400 F.3d 1227 (10th Cir. 2004). They also point that Poole's results are not exclusively based on Blair, but on additional calculations by the SBA. And they argue that Georgia law is not controlling, for a variety of reasons to be discussed below.

The plaintiff's experts must be shown to have the specialized knowledge, experience, or training which would materially assist the finder of fact in understanding the facts of the case, and that methodology adopted by those experts was reliable. *Bitler*, cited by the plaintiff, merely establishes that a given methodology may not be "susceptible to testing or peer review." *Bitler*, 4004 F.3d at 1235. The Court of Appeals held that such corroborative testing was not required, where the district court had "specifically found that [the expert]'s methodology in reaching his conclusion about the cause of the explosion was sound." *Id*. The goal of the court is to determine whether there is a reliable "relation between an expert's method, the proffered conclusions, and the particular factual circumstances of the dispute." *Id*. at 1234.

The court is unable to make these determinations with respect to Blair's proposed testimony. Blair has no experience in opening restaurants. He has not been shown to have any particular experience, skill, or training in analyzing new opportunities for restaurants or for quantifying the likely profit for such new endeavors. The only circumstance in which he has done so is apparently in the case now before the court. Further, none of the underlying data on which Blair made his calculations is before the court. As a result, the court cannot weigh Blair's conclusions against the underlying data. Finally, there has been no showing that the type of economic data which Blair cites – raw numbers about traffic counts on nearby highways and general percentages of the persons in a given community who dine out – are data of the sort which are generally relied upon in the restaurant business as factors which will yield reliable estimates of what a new restaurant can expect to make in profit.

The unsupported nature of Blair's assertions render it impossible to accept Poole's calculations of lost profits as well, since Poole's assertions are inherently tied to Blair's numbers. In this context, the SBA's calculations are not an independent source: it too apparently relied entirely on Blair's numbers – after apparently reducing them by a given percentage. There has been no showing that the SBA's calculations were separate and independent from Blair's, or that the author of the SBA's projections himself had any specialized knowledge, skill, or training in projecting the profits for a new restaurant.

The plaintiff correctly notes that the time for dispositive motions passed prior to the defendants' motion to exclude the experts, and thus court should not consider what it might recover at trial, and should limit itself to determining the qualifications of the experts in question. Nevertheless, it would serve little purpose to wholly ignore, at the present time, the issue of the potential application of Georgia law, only to inevitably address the issue when it came to framing instructions for the jury.

Georgia law precludes recovery for lost profits in a commercial venture, as these "are too speculative, remote and uncertain.'" *Molly Pitcher Canning Co. v. Central of Ga. Ry.*, 149 Ga. App.

5, 10, 253 S.E.2d 391, 296 (1979) (*quoting Georgia Grain Grower's Ass'n v. Graven*, 95 Ga. App. 741, 747, 98 S.E.2d 633 (1957)). *See also Complete Concepts v. General Handbag Corp.*, 880 F.2d 382, 390 (11th Cir.1989); *Crider, Inc. v. Convenience Food Systems*, No. CV604-102, 2005 WL 3299563, at *4 (S.D. Ga. Dec. 5, 2005); *Springwell Dispensers v. Hall China Co.*, 204 Ga. App. 245, 419 S.E.2d 112 (Ga. App. 1992); *Radlo of Ga., Inc. v. Little*, 129 Ga.App. 530, 199 S.E.2d 835, 838 (1973)). Lost profits are recoverable "only if the business has a proven 'track record' of profitability." *Empire Shoe Co. v. NICO Industries*, 197 Ga.App. 411, 414, 398 S.E.2d 440, 443 (1990).

The plaintiff argues that the "new business rule" may no longer be in effect in Georgia, noting *General Elec. Co. v. Lowe's Home Centers, Inc.*, 279 Ga. 77, 608 S.E.2d 636 (2005), where the court declined to decide a question certified from the Eleventh Circuit as to whether the "new business rule" would apply to bar the recovery of nationwide home-improvement store's claim for lost profits. The court determined that it need not resolve the question, since it determined affirmatively a second certified question, whether the "economic loss doctrine" would bar the award. The plaintiff also notes the general trend away from such a rule, citing *O'Tool v. Genmar Holdings*, 387 F.3d 1188 (10th Cir. 2004).

However, there is little basis for concluding from this that Georgia no longer follows the new business rule. First, it is clear that the Eleventh Circuit in certifying the question in *General Electric* did so not because it believed the new business rule itself was obsolete in Georgia, but rather to decide whether the rule should be applied in a particularly exceptional case. First, the court noted that the "new business rule" may not apply "when the new business was part of a chain of stores or a nationwide franchise" with substantial experience operating new stores. *Lowe's Home Centers v. General Electric*, 381 F.3d 1091, 1097 (11th Cir. 2005). Second, the court stressed the exceptional nature of Lowe's evidence, in that it "has more reliable evidence to support the computation of lost profits than a typical new business; Lowe's experts analyzed the performance of the existing Rome store as well

5

as extensive data regarding the performance of numerous other Relocation Stores opened in existing markets." *Id.* These exceptional considerations, or potential exceptions to the new business rule are not relevant here.

*O'Tool* also fails to support the plaintiff's argument. In that case, the court upheld an award for lost profits under Delaware law. First, and "[n]otably, the Delaware Supreme Court has not expressly adopted or rejected the new business rule." 387 F.3d at 1204. Second, the court determined that first that there was a trend "away from strict application of the new business rule among the states generally." *Id*. Finally, the *O'Tool* court noted that in a recent decision of the Delaware Supreme Court, *Moody v. Nationwide Mutual Insurance Company*, 549 A.2d 291 (Del.1988), the court had directly suggested that the state would not strictly apply the new business rule.

The present case is different. Georgia has explicitly, if not recently, affirmed its adherence to the new business rule. And there are no grounds for believing that it has altered its position. In sum, the court finds that at trial issues of lost profits would inevitably be excluded from the jury's consideration, based on Georgia law.

This result is wholly consistent with the court's general conclusion that the expert evidence presented by Blair and Poole on the issue of lost profits is not sufficiently reliable to be presented to the jury. The Georgia rule is a general reflection of the inherent difficulties of calculating accurately the profits which a new business might generate. Even courts which permit the recovery of lost profits for new businesses still require that such losses be proved "with reasonable certainty." *Butler v. Westgate State Bank*, 226 Kan. 581, 602 P.2d 1276 (Kan. 1979). The proposed expert testimony offered by plaintiff falls far short of this mark.

IT IS ACCORDINGLY ORDERED this 17th day of July, 2008 that the defendant's Motion to Dismiss (Dkt. No. 143) is granted as provided herein.

 s/ J. Thomas Marten  
J. THOMAS MARTEN, JUDGE